UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

REBECCA ROBARE                  )
                                     )
           Plaintiff,          )
                                     )
          v.                )          Civil Action No.
                                     )          <u>8:21-CV-536 (FJS/CFH)</u>
WILSON APPLIANCE CENTERS, INC.  )
and NATHAN WILSON            )          **JURY TRIAL**
                                     )          **DEMANDED**
           Defendant.      )
                                     )

_____)

## <u>COMPLAINT AND JURY DEMAND</u>

### <u>PARTIES</u>

1.      The Plaintiff, Rebecca Robare ("Ms. Robare" or the "Plaintiff"), is a 48-year-old female resident of the state of New York, residing at 32 Cinnamon Ridge, Keeseville, New York 12944.  Keeseville, NY is in Clinton County.

2.      Defendant Wilson Appliance Centers, Inc. (the "Company" and "Wilson's Appliance") is a domestic for-profit corporation doing business in the state of New York.  The Company is incorporated in New York and its principal office is located at 795 RTE #3, Suite 100, Plattsburgh, New York, 12901.

3.      Defendant Nathan Wilson ("Mr. Wilson") is an adult male, who upon information and belief resides in New York.  At all relevant times, Mr. Wilson was the President and owner of Wilson's Appliance.  Mr. Wilson is named in both his individual and official capacities.

## JURISDICTION AND VENUE

4.     This court has subject matter jurisdiction under 28 U.S.C. §1331 because Ms.

Robare has brought a claim pursuant to the Americans with Disabilities Act ("ADA") 42 U.S.C.

§§ 1201 et seq. and the Family and Medical Leave Act ("FMLA") 29 U.S.C. §2615.  The court

may exercise supplemental jurisdiction over Ms. Robare's state law claims.  28 U.S.C. §1367.

5.     This court has jurisdiction over Defendant Wilson's Appliance because Wilson's

Appliance is a resident of New York.  Indeed, Wilson's Appliance is incorporated in New York

and Wilson's Appliance's principal place of business is located in New York.  Additionally,

Wilson's Appliance has engaged in and transacted business in the State of New York, including

by managing and/or operating a business in New York and/or employing Ms. Robare in New

York, and Ms. Robare's causes of action stem largely from Defendants' business transactions

within the State of New York.  Indeed, Ms. Robare was employed by the Defendants in the State

of New York, was managed and supervised by the Defendants in the State of New York, was

discriminated against and harassed by the Defendants in the State of New York and was

terminated by the Defendants in the State of New York.

6.     This court has jurisdiction over Mr. Wilson (in both his individual and official

capacity) because, upon information and belief, he is a resident of New York.  Additionally, Mr.

Wilson availed himself of New York law by transacting business, including by owning and

managing Wilson's Appliance while it conducted business in New York, by being employed by

Wilson's Appliance and/or managing employees in the State of New York.  Mr. Wilson served

in a supervisory capacity over Ms. Robare in New York, provided directives and managed Ms.

Robare's employment in New York, and terminated her employment in the State of New York.

7.     This court thus has jurisdiction over the Company and Mr. Wilson (together and individually the "Defendants") including, but not limited to, because they purposefully availed themselves of New York law by operating a business in New York, transacting business in New York, and employing employees (including, during the times relevant to this Complaint, Ms. Robare herself) in New York.

8.     Venue is appropriate in the Northern District of New York because Defendant Wilson's Appliance's principal place of business is located in the Northern District of New York and the acts or omissions giving rise to the claims in this Complaint occurred in the Northern District of New York.

9.     Venue is also appropriate in the Northern District of New York because Ms. Robare lives in Keeseville, New York, which is located in the Northern District of New York. Ms. Robare worked for the Company in Plattsburg, New York, which is also located in the Northern District of New York.

## STATEMENT OF FACTS

10.     On or around July 23, 2018, Ms. Robare was hired by the Company as a Service Writer based in the Company's Plattsburg, NY facility.

11.     At all relevant times, the Company employed 20 or more employees for 20 or more calendar weeks within the last 12 months.

12.     As such, at all relevant times, the Company was (and still is) an employer under Federal and state anti-discrimination laws.

13.     At all relevant times, the Company employed 50 or more employees during 20 or more calendar workweeks during the relevant calendar years.

14.     Accordingly, upon information and belief, at all relevant times, the Company was an employer under the Family and Medical Leave Act ("FMLA").

15.     Furthermore, at all relevant times, the Company employed 499 or fewer employees during 20 or more calendar weeks during the current or preceding calendar year.

16.     Accordingly, at all relevant times, the Company was a covered employer under the Families First Coronavirus Response Act ("FFCRA"), including the Emergency Paid Sick Leave provisions contained within the FFCRA.

17.     At all relevant times, Ms. Robare was a qualified employee with a satisfactory performance history with the Company.

18.     Indeed, due to her strong performance and time with the Company, in or around July 2019, Ms. Robare was promoted to a service manager position.

19.     Ms. Robare has been diagnosed with bronchial asthma (her "asthma").

20.     At the time that Ms. Robare was offered employment with the Company, the Company and Mr. Wilson were not aware that she suffered from this, or any other, disability.

21.     Ms. Robare's asthma is a physical condition which substantially limits one or more of her major life activities, including, but not limited to, her breathing, exercising, and ability to recover from illnesses caused by influenza ("flu") and coronavirus ("COVID-19"). Ms. Robare's asthma is a physical condition that also substantially impairs one or more of her major bodily functions, including, but not limited to, her respiratory system.  Accordingly, at all relevant times, Ms. Robare was (and still is) disabled under federal and New York state law.

22.     Furthermore, due to her underlying disability, Ms. Robare was (and still is) at a higher risk for complications and life-threatening outcomes from COVID-19.

23.     Mr. Wilson constituted Ms. Robare's manager at the Company.

24.     After commencing employment, Ms. Robare disclosed her asthma disability to Mr. Wilson during conversations in the workplace.

25.     Mr. Wilson is younger than Ms. Robare and is a non-disabled individual.

26.     Ms. Robare would bring her asthma inhaler to work and used it occasionally in public to provide periodic treatment from her asthma related symptoms.  Mr. Wilson saw Ms. Robare use her asthma-related inhaler at work.

27.     During Ms. Robare's employment, and after Mr. Wilson learned that Ms. Robare suffered from asthma, Ms. Robare noticed that Mr. Wilson seemed to hold her (Ms. Robare) to higher standards than the younger and/or non-disabled employees.

28.     For example, Mr. Wilson criticized Ms. Robare's work more than he did that of another, younger female employee named Amber Smith ("Ms. Smith").

29.     Notably, Ms. Smith was in her early 30's and at least ten years younger than Ms. Robare.  Upon information and belief, Ms. Smith is also a non-disabled individual.

30.     Indeed, many of the younger and/or male employees would frequently engage in non-business-related activities during the day (such as using social media on their cellphones or casually talking with other employees).

31.     Upon information and belief, Mr. Wilson did not reprimand and/or discipline these younger and/or male employees in any meaningful manner for this behavior.

32.     However, Mr. Wilson would speak to Ms. Robare in a demeaning tone of voice and accused Ms. Robare of not doing work when she was working and snidely asked her if she had enough work to do.

33.     Notably, Mr. Wilson did not treat the younger and/or male employees like this.

34.     Ms. Robare conveyed protected discrimination concerns to Mr. Wilson about this disparate treatment, but he brushed aside her concerns.

35.     Notably, on one occasion, Ms. Robare tilted her computer screens in order to see the screen better, and Mr. Wilson aggressive slammed the screens apart and demanded that she keep them separated so he could see what Ms. Robare was doing at all times.

36.     Notably, Ms. Smith (a younger employee) frequently used her computers for personal use throughout the day, but Mr. Wilson did not treat her in a similar manner, and would not tell her to keep her computer screens apart or otherwise visible.

37.     Throughout Ms. Robare's employment, numerous male employees also treated her worse, seemingly due to her age and/or gender.

38.     For instance, a male technician at the Company, Mark Laduke ("Mr. Laduke"), was frequently overtly hostile and aggressive with Ms. Robare when he spoke with her.

39.     Upon information and belief, Mr. Laduke is a non-disabled individual.

40.     Mr. Laduke seemed to take issue with Ms. Robare due to her age and gender, and the fact that she (a female employee) was his superior.

41.     Mr. Laduke's behavior escalated in mid-2019 and he would shout at Ms. Robare and direct derogatory terms at her, such as calling her a "bitch" on numerous occasions.

42.     Notably, Ms. Robare had no authority over Mr. Laduke.  Thus, Ms. Robare did not have the authority to discipline Mr. Laduke, as disciplinary actions had to be implemented by Mr. Wilson.

43.     Notably, Mr. Laduke did not speak to the male employees like that, nor did he refer to the male employees as "bitches" or using other demeaning gender-related epithets.

44.     Mr. Laduke would further make disparaging comments to Ms. Robare and spoke to her in a degrading tone of voice, which seemed motivated by Mr. Laduke's gender-related biases.

45.     Indeed, it was clear that Mr. Laduke's behavior was discriminatory in nature due to the fact that Ms. Robare is a woman.  Furthermore, it was in keeping with a broader culture at the Company in which male employees were allowed to demean female employees with impunity.

46.     Ms. Robare contacted Mr. Wilson on several occasions and raised protected concerns about Mr. Laduke's behavior.  Indeed, Ms. Robare clearly conveyed the fact that she was being subjected to harassing gender-related language (including being called a "bitch").

47.     Ms. Robare also conveyed protected concerns to Mr. Wilson about the fact that he did not seem to take her gender-related harassment concerns seriously.

48.     Shockingly, after Ms. Robare raised protected gender-related harassment concerns to Mr. Wilson, he brushed off her concerns and did not discipline Mr. Laduke in any meaningful manner for his discriminatory and harassing behavior.

49.     Furthermore, Ms. Robare did not have, nor was she given, any authority to discipline Mr. Laduke herself.

50.     Instead, Mr. Wilson told Ms. Robare to be more "understanding" towards Mr. Laduke.

51.     Notably, Mr. Laduke continued to call Ms. Robare a "bitch" and demean her by constantly criticizing her in a disrespectful tone that appeared to clearly be motivated by gender-related bias throughout her employment.

52.     Around that time, in or around mid-2019, the Company also hired on a new female service writer, Miya Wickramasinghe ("Ms. Wickramasinghe").

53.     Ms. Wickramasinghe is at least two decades younger than Ms. Robare and non-disabled.

54.     In or around March 2020, the COVID-19 pandemic had become widespread, particularly in the New York State area.

55.     Around this same time, Ms. Robare raised concerns to Mr. Wilson about the fact that her asthma disability caused her to be more susceptible to the coronavirus as well as to life threatening symptoms if she became exposed.  Ms. Robare sought to discuss measures that could be taken to minimize risk in light of her disability.

56.     Mr. Wilson seemed annoyed by Ms. Robare's statement, and curtly informed Ms. Robare to wash her hands more.  Otherwise, Mr. Wilson declined to engage in any interactive dialogue with Ms. Robare related to potential accommodations and did not undertake any measures to reduce Ms. Robare's risk of exposure to the Coronavirus at work.

57.     On or around March 26, 2020, while at work, Ms. Robare began to experience symptoms of body aches, trouble breathing, and a fever.  Indeed, Ms. Robare was presenting with symptoms typically associated with COVID-19.

58.     Ms. Robare contacted Mr. Wilson and informed him of the fact that she was experiencing potential COVID-19 symptoms.  She further mentioned that she was having trouble breathing and that it was likely due to her asthma.

59.     Ms. Robare requested the reasonable disability-related accommodation of a medical leave to seek medical care due to her symptoms.

60.     Mr. Wilson seemingly approved Ms. Robare's reasonable accommodation request.

61.     Ms. Robare's request for a disability-related reasonable accommodation also functioned as a request for qualifying FMLA leave.

62.     The symptoms that Ms. Robare was experiencing, which were likely a result of her diagnosed disability and/or her disability's interaction with potential COVID-19, constituted a serious medical condition causing periods of incapacity and required continuing treatment, and thus served as a legitimate basis for protected leave for FMLA purposes.

63.     Notably, by this time (March 2020), Ms. Robare had been an employee for more than 12 months and had worked in excess of 1250 hours during the preceding 12-month period.

64.     Furthermore, at all relevant times, the Company employed 50 or more employees within a 75-mile radius of where she worked in Plattsburgh, New York.

65.     As such, Ms. Robare was an eligible employee for FMLA leave.

66.     Around this same time, Ms. Robare contacted her medical provider in order to obtain medical treatment due to her ongoing symptoms.

67.     At this time, COVID-19 tests were in short supply and often subject to significant delays in reporting results.  Ms. Robare's medical provider instructed that her symptoms were consistent with having COVID-19 and indicated that she should operate on the understanding that she was indeed infected with COVID-19.  Based on her symptoms and her underlying disability, Ms. Robare's provider instructed that she should self-quarantine in keeping with government-issued COVID-19 protective measures and continue to remain out of work for approximately 2 weeks.

68.     Shortly after the appointment with her doctor, Ms. Robare contacted Mr. Wilson and explained that her medical provider had told her to self-quarantine for 2 weeks in keeping with government guidance following her exhibiting of COVID-19 symptoms.  Accordingly, she requested the reasonable disability-related accommodation of taking leave to obtain treatment and based on her provider's order that she self-quarantine for 2 weeks (until April 13, 2020) while she recovered.

69.     Ms. Robare further provided the Company with medical documentation from her provider.

70.     This disability-related accommodation request further qualified as a request for leave protected under the FMLA.

71.     Mr. Wilson seemingly approved her request.

72.     In or around the week of April 6, 2020, Ms. Robare was still experiencing symptoms related to COVID-19 and/or her disability.  Indeed, she was experiencing a severe cough, which was likely related to both her illness and her asthma disability, including the interaction whereby her asthma disability exacerbated other illness symptoms.

73.     Ms. Robare attended an appointment with her medical provider and, based on her ongoing symptoms (and disability-related weakened immune system), her provider recommended that she continue to remain out of work for a further short medical leave and continue to quarantine in keeping with Government guidance.

74.     Indeed, based on her medical provider's recommendation, Ms. Robare contacted the Company and noted that she was still suffering symptoms consistent with COVID-19, which appeared to be exacerbated by her asthma disability.  She noted that her provider had instructed that she continue to quarantine in keeping with government guidance while she recovered.

75.     Accordingly, Ms. Robare requested the reasonable disability-related accommodation of taking further leave.

76.     Notably, this request was not an undue burden on the Company, as she gave the Company advanced notice of her request.

77.     The ongoing symptoms that Ms. Robare was experiencing, which were likely a result of the illness causing her COVID-19-like symptoms, and/or her asthma disability's interaction with this COVID-like illness, constituted a serious medical condition causing periods of incapacity and continuing treatment and served as a legitimate basis for protected leave for FMLA.

78.     Furthermore, Ms. Robare's symptoms (related to COVID-19 and/or her disability) and the instruction to self-quarantine from her health care provider, constituted a legitimate basis for leave under the FFCRA, which had come into effect by this time.  Indeed, Ms. Robare was unable to work, remotely or otherwise, due to her symptoms.

79.     Indeed, Ms. Robare's medical provider instructed Ms. Robare to self-quarantine because the symptoms she was experiencing at the time were consistent with COVID-19, and thus the provider instructed that she should behave consistent with having COVID-19.  Due to her weakened immune system (as well as testing bottlenecks), Ms. Robare's provider instructed Ms. Robare to avoid crowded areas such as hospitals and COVID-19 testing sites and to self-quarantine instead based on a potential diagnosis of suspected COVID-19, which was consistent with the medical recommendations from the state and federal health authorities.

80.     As such, Ms. Robare was an eligible employee for leave protected under the FFCRA, as well as the FMLA.

81.     Because Ms. Robare herself was incapacitated and complying with self-quarantine, Ms. Robare's husband, Timothy Robare ("Mr. Robare"), provided the Company with the medical paperwork on her behalf and Mr. Wilson indicated to Mr. Robare that Ms. Robare's disability-related request for leave based on her COVID-symptoms and exacerbated asthma disability was granted.

82.     Although she experienced a number of seeming "long-haul symptoms," after period of leave, Ms. Robare was eventually able to return to work.

83.     On or around May 11, 2020, Ms. Robare returned to work as scheduled.

84.     On or around June 22, 2020, Ms. Robare experienced a severe flare up of gastrointestinal symptoms, including symptoms of nausea and vomiting, which were symptoms of a condition that Ms. Robare had in the past (her "gastroesophageal reflux disease"), and diarrhea (collectively, Ms. Robare's "gastrointestinal disability").

85.     Indeed, Ms. Robare was also later diagnosed with a stomach ulcer.

86.     Ms. Robare also experienced a severe flare up of cardiac symptoms, including, but not limited to, symptoms of diaphoresis (severe perspiration) and essential hypertension (collectively, Ms. Robare's "cardiac disability").

87.     Notably, Ms. Robare's chronic gastrointestinal symptoms (in part due to her gastroesophageal reflux disease (and related symptoms) and stomach ulcer conditions) were individually and collectively physical conditions which substantially limited one or more of Ms. Robare's major life activities, including, but not limited to, her ability to eat and digest food. Ms. Robare's chronic gastrointestinal symptoms and stomach ulcer were also conditions which substantially limited one or more of her major bodily functions, including, but not limited to, her gastrointestinal function.

88.     Ms. Robare's chronic cardiac symptoms were individual and collectively a condition(s) which substantially limited one or more of Ms. Robare's major life activities, including, but not limited to, her ability to breathe, regulate her body temperature, and maintain her energy levels.  Ms. Robare's cardiac symptoms also were also conditions which substantially impaired limited one or more of her major bodily functions, including, but not limited to, her circulatory and respiratory systems.

89.     Accordingly, at all relevant times Ms. Robare was (and still is) further disabled under federal and New York state law.

90.     Furthermore, the Company regarded Ms. Robare as disabled.

91.     The symptoms that Ms. Robare was experiencing also constituted a serious medical condition(s) causing periods of incapacity and continuing treatment and served as a legitimate basis for protected leave for FMLA purposes.

92.     On or around June 22, 2020, Ms. Robare contacted Mr. Wilson and described a flare up of her disabilities-related symptoms she was experiencing (including hypertension, a related symptom of her cardiac disability, and nausea and vomiting-related symptoms of her gastrointestinal disability), noted that she had been experiencing such symptoms on a chronic basis, and requested the reasonable disability-related accommodation of time off to obtain medical care and/or recuperate.

93.     In the Company's Position Statement, the Company admitted that Ms. Robare disclosed that she was experiencing disability-related symptoms (i.e., headache, nausea, vomiting, and high blood pressure).

94.     Notably, this disability-related accommodation request further qualified as a request for leave protected under the FMLA.

95.     Mr. Wilson seemingly granted Ms. Robare's request.

96.     On or around June 25, 2020, due to the severity of Ms. Robare's symptoms, she sought medical care and attended an emergency appointment with her primary care physician.

97.     Ms. Robare's doctor further recommended that she take a short medical leave (approximately 2 weeks) in order to undergo further testing related to her condition.  Indeed, her provider recommended that she attend a follow up appointment with a specialist.

98.     Around this same time, Ms. Robare was also prescribed with medication in order to mitigate some of the severe symptoms that she was experiencing.

99.     On or around June 30, 2020, Ms. Robare contacted Mr. Wilson by text message and disclosed to him the fact that she had been receiving medical care due to her disability-related symptoms.  Ms. Robare further described the fact that she was experiencing significant problems related to her blood pressure and/or her heart, including her "fever of 100.1 and blood pressure of 148/109" and that she "[s]aw [her] dr last night [who] put her on additional blood pressure meds [but that Ms. Robare was] possibly going to er [that day] if [they] cant get blood pressure down."

100.    Ms. Robare requested the reasonable disability-related accommodation of a short extension of her medical leave based on her doctor's recommendation and in order to receive further medical care.  Indeed, this request further qualified as a request for further leave protected under the FMLA.

101.    Mr. Wilson seemingly granted Ms. Robare's request.

102.    On or around July 1, 2020, Ms. Robare again contacted Mr. Wilson and informed him that the medication she was taking due to her blood pressure was causing very serious side effects and/or that she was still experiencing very severe symptoms related to her heart.

103.    On or around July 2, 2020, Ms. Robare's doctor diagnosed her with hypertensive crisis due her severely elevated pulse and blood pressure.  Ms. Robare's doctor further recommended that she remain out of work for an additional period of time due to the symptoms that she was experiencing due to her new mediation.

104.    Indeed, Ms. Robare's provider gave her a note indicating that she needed a short extension of her disability-related leave in order to adjust to the medication that she had been prescribed.

105.    Shortly thereafter, Ms. Robare contacted Mr. Wilson by text message and disclosed the fact that she had been diagnosed with "hypertensive crisis" related to her underlying cardiac disability.  Ms. Robare further requested the reasonable disability-related accommodation of medical leave due to her disability and/or the symptoms she was experiencing related to her disability-related medication.

106.    This request further qualified as a request for leave protected under the FMLA.

107.    Importantly, at this time, Ms. Robare had not exceeded the 12 weeks of leave allotted under the FMLA and was within the 12-week period.

108.    Furthermore, Ms. Robare's FMLA leave was occurring both before, during, and after her FFCRA leave.

109.    Notably, this request was not an undue burden on the Company.

110.    Mr. Wilson seemingly granted Ms. Robare's request.

111.    On or around July 7, 2020, Ms. Robare contacted Mr. Wilson to keep him apprised of her condition and to let him know that she was waiting on test results.

112.    On or around July 9, 2020, Ms. Robare received the results, which indicated that the flare up of her symptoms was related to her liver.  Ms. Robare contacted Mr. Wilson by text

message and informed him that she "[f]ound out yesterday that something is wrong with [her] liver." She also told Mr. Wilson that her medical team was "setting up an appt asap with a GI specialist so [she] can get extensive tests done."

113.   Ms. Robare further requested the reasonable disability-related accommodation of taking further disability-related leave until on or around July 20, 2020, based on her doctor's recommendation and in order to receive further medical care.

114.   Indeed, this request further qualified as a request for leave protected under the FMLA.

115.   Notably, by that time, Ms. Robare had not exceeded the 12 weeks of leave allotted under the FMLA and was within the 12-week period.

116.   Furthermore, Ms. Robare's FMLA leave was occurring both before, during, and after her FFCRA leave.

117.   Mr. Wilson did not respond to Ms. Robare's request, and so Mr. Wilson further contacted Robert Miller ("Mr. Miller"), an administrator in Company's payroll department, and informed Mr. Miller of her disability-related accommodation request of leave until July 20, 2020, (which further qualified as FMLA protected leave).

118.   Mr. Miller confirmed Ms. Robare's return to work date would be July 20, 2020.

119.   On or around July 20, 2020, Ms. Robare returned to work as scheduled. At the time Ms. Robare returned to work, she was still within the 12-week period of leave protected under the FMLA and thus her leave remained protected under the FMLA through her July 20, 2020 attempt to return to work.

120.     Shortly after arriving to work, and before being restored to her position, Ms. Robare met with Mr. Wilson who curtly told Ms. Robare that the Company no longer had a job for her.

121.     Mr. Wilson told Ms. Robare that she had been out too long.

122.     It was clear that Mr. Wilson was terminating Ms. Robare due to her disabilities and/or requests and utilization of reasonable accommodations (i.e., disability-related leave).

123.     It was further clear that Ms. Robare's reasonable accommodation requests, which were seemingly granted at the time, were now retroactively denied.

124.     Mr. Wilson also told Ms. Robare that he hired someone two weeks prior to replace Ms. Robare, while she was still out on disability-related leave (which was also protected FMLA leave).

125.     Notably, the individual who replaced Ms. Robare was a much younger individual, who was in her early 20s and non-disabled.

126.     As such, Ms. Robare was involuntarily terminated on or around July 20, 2020.

127.     On or around October 28. 2020, Ms. Robare timely filed a Charge of Discrimination (the "Charge") with the New York State Division of Human Rights ("NYSDHR") (Charge No. 10210098) and the United States Equal Employment Opportunity Commission ("EEOC") (Charge No. 16GC100476).

128.     On or around March 8, 2021, Ms. Robare requested an administrative convenience dismissal.

129.     On or around March 24, 2021, the NYSDHR released its jurisdiction through an administrative convenience dismissal.

130.    Ms. Robare notified the EEOC of her intent to file a complaint in court and, accordingly, requested that the EEOC provide a right to sue letter and permit Ms. Robare to file in court.

131.    The EEOC issued a Right to Sue on or around April 14, 2021.

132.    This Complaint is timely filed in compliance with the timeframes of relevant laws and requirements.

**COUNT I**

**(Disability Discrimination and Failure to Accommodate in Violation of the New York State Human Rights Law, Executive Law Article 15, Section 296)**

**Ms. Robare v. all Defendants**

133.    Ms. Robare incorporates all paragraphs above and below as if set forth fully herein.

134.    At all relevant times, the Company employed four or more persons.

135.    The Company is an employer under the definition of Executive Law Article 15 ("NYSHRL").

136.    Ms. Robare suffers (and at all relevant times suffered) from disabilities, including, bronchial asthma, gastrointestinal and cardiac symptoms (including, but not limited to, nausea and vomiting, gastroesophageal reflux disease, diaphoresis (severe perspiration), hypertension, diarrhea, and hypertensive crisis).  Each of these disabilities, both individually and collectively, are impairments that substantially limit one or more of her major life activities, including, but not limited to, Ms. Robare's breathing, exercising, ability to recover from illnesses such as the flu and COVID-19, eating, digesting food, and ability to regulate her body temperature.  They further substantially impair her bodily functions, including, but not limited to, her automatic

nervous system, circulatory, gastrointestinal, and respiratory functions.  Accordingly, Ms.

Robare is (and at all relevant times was) disabled under the NYSHRL.

137.    At all relevant times, Ms. Robare was a qualified employee and was capable of

performing the essential functions of her job with or without one or more reasonable

accommodations.

138.    Ms. Robare disclosed her disabilities to the Defendants, and/or the Defendants

were aware of Ms. Robare's disabilities, and/or the Defendants regarded Ms. Robare as disabled.

139.    Ms. Robare requested and/or utilized disability-related reasonable

accommodations that would have assisted her in performing the essential functions of her job.

These requested reasonable accommodations included, but were not limited to, time off from

work for treatment and recovery related to her disabilities, as well as protective measures to

maximize her safety in light of her distinctive disability symptoms and her resulting vulnerability

to the COVID-19 pandemic.

140.    The disability-related accommodations requested by Ms. Robare did not pose an

undue burden on the Defendants.

141.    The Defendants failed to engage in an interactive dialogue related to one or more

of these disability-related accommodation requests.

142.    The Defendants unlawfully denied one or more of Ms. Robare's disability-related

accommodation requests, including, but not limited to, refusing to undertake protective measures

in light of the COVID-19 pandemic and constructively denying her request for disability-related

leave by terminating her employment shortly after Ms. Robare attempted to return to work from

disability-related leave.

143.    The Defendants likewise failed to explore alternative accommodations by failing to engage in an interactive dialogue with Ms. Robare related to her disabilities and accommodation requests.

144.    The Defendants discriminated against Ms. Robare due to her disabilities by subjecting Ms. Robare to adverse actions, including, but not limited to, subjecting Ms. Robare to a harassing and otherwise hostile work environment, discriminatorily criticizing her and/or holding her to higher standards than her non-disabled and/or younger coworkers, denying one or more of her disability-related reasonable accommodation requests, and/or terminating Ms. Robare's employment.

145.    Non-disabled employees of the Company were treated more favorably than Ms. Robare including through not being improperly harassed and/or not being terminated.

146.    Upon information and belief, the Company replaced Ms. Robare with a lesser or similarly qualified, non-disabled employee.

147.    Mr. Wilson discharged, expelled, barred, and/or discriminated against Ms. Robare in her compensation, conditions, and/or privileges of employment based on rights afforded to Ms. Robare under the NYSHRL.

148.    Mr. Wilson aided, abetted, incited, coerced, and/or compelled the Company's discriminatory conduct, including, but not limited to, by providing or attempting to provide assistance to individuals participating in conduct forbidden under the NYSHRL.

149.    The Defendants' actions were willful, wanton, reckless, and/or involved a conscious disregard of the rights of Ms. Robare and/or conduct so reckless to amount to such disregard.

150. As a direct and proximate result of the Defendants' violations of the NYSHRL, Ms. Robare has suffered and continues to suffer damages, including, but not limited to, lost compensation and benefits, other monetary harms, reduced earning capacity, pain and suffering, loss of enjoyment of life, and emotional damages.

151. Ms. Robare seeks all damages to which she is entitled, including, but not limited to, lost compensation and benefits (including back pay and front pay), lost benefits, reduced earning capacity, other financial damages, uncapped compensatory damages (including, but not limited to, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses), punitive damages, injury to reputation, interest, attorneys' fees, and costs.

## COUNT II

**(Disability Discrimination and Failure to Accommodate in Violation of the Americans with Disabilities Act, 42 U.S.C. §§12101, et seq.)**

### Ms. Robare v. The Company

152. Ms. Robare incorporates all paragraphs above and below as if set forth fully herein.

153. During all relevant times, the Company was an employer under the Americans with Disabilities Act, 42 U.S.C. §§12101, et. seq. (hereinafter the "ADA"), because it employed more than 15 persons for 20 or more calendar weeks within the previous 12-month period.

154. At all relevant times, Ms. Robare was a qualified employee and was capable of performing the essential functions of her job with or without one or more reasonable accommodations.

155. Ms. Robare suffers (and at all relevant times suffered) from disabilities, including, bronchial asthma, gastrointestinal and cardiac symptoms (including, but not limited to, nausea

and vomiting, gastroesophageal reflux disease, diaphoresis (severe perspiration), hypertension, diarrhea, and hypertensive crisis). Each of these disabilities, both individually and collectively, are impairments that substantially limit one or more of her major life activities, including, but not limited to, Ms. Robare's breathing, exercising, ability to recover from illnesses such as the flu and Covid-19, eating, digesting food, and ability to regulate her body temperature. They further substantially impair her bodily functions, including, but not limited to, her automatic nervous system, circulatory, gastrointestinal, and respiratory functions. Accordingly, Ms. Robare is (and at all relevant times was) disabled under the ADA.

156.    Ms. Robare disclosed her disabilities to the Company, and/or the Company was aware of Ms. Robare's disabilities, and/or the Company regarded Ms. Robare as disabled.

157.    Ms. Robare requested and/or utilized disability-related reasonable accommodations that would have assisted her in performing the essential functions of her job. These requested reasonable accommodations included, but were not limited to, time off from work for treatment and recovery related to her disabilities, as well as protective measures to maximize her safety in light of the COVID-19 pandemic.

158.    The disability-related accommodations requested by Ms. Robare did not pose an undue burden on the Company.

159.    The Company failed to engage in an interactive dialogue related to one or more of these disability-related accommodation requests.

160.    The Company unlawfully denied one or more of Ms. Robare's disability-related accommodation requests, including, but not limited to, refusing to undertake protective measures in light of the COVID-19 pandemic and constructively denying her request for disability-related

leave by terminating her employment shortly after Ms. Robare attempted to return to work from disability-related leave.

161.    The Company discriminated against Ms. Robare due to her disabilities by subjecting Ms. Robare to adverse actions, including, but not limited to, subjecting Ms. Robare to a harassing and otherwise hostile work environment, discriminatorily criticizing her and/or holding her to higher standards than her non-disabled and/or younger coworkers, denying one or more of her disability-related reasonable accommodation requests, and/or terminating Ms. Robare's employment.

162.    Non-disabled employees of the Company were treated more favorably than Ms. Robare including through not being improperly harassed, not subjected to a hostile work environment and/or not being terminated.

163.    Upon information and belief, the Company replaced Ms. Robare with a lesser or similarly qualified, non-disabled employee.

164.    The Company acted with malice and/or with reckless indifference to the federally protected rights of Ms. Robare.

165.    As a direct and proximate result of the Company's violation of the ADA, Ms. Robare has suffered and continues to suffer damages, including, but not limited to, lost compensation and benefits, other monetary harms, loss of earning capacity, pain and suffering, loss of enjoyment of life, and emotional damages.

166.    Ms. Robare seeks all damages to which she is entitled, including, but not limited to, lost compensation and benefits (including, but not limited to, back pay and front pay), other monetary damages, compensatory damages (including, but not limited to, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and

other nonpecuniary losses), injury to reputation, diminished earning capacity, punitive damages, interest, attorneys' fees, and costs.

## Count III

### (Discrimination Based on Age in Violation of New York State Human Rights Law, Executive Law Article 15, Section 296

### Ms. Robare v. All Defendants

167.    Ms. Robare incorporates all paragraphs above and below as if set forth fully herein.

168.    At all relevant times, the Company employed four or more persons.

169.    The Company is an employer under the definition of Executive Law Article 15 ("NYSHRL").

170.    The Company, by and through its agents, harassed and discriminated against Ms. Robare with respect to her compensation, terms, conditions, or privileges of employment, because of Ms. Robare's age (born in 1972).

171.    More specifically, the Company subjected Ms. Robare to adverse actions because of her age, including, but not limited to, a hostile and harassing workplace, denial of one or more of her disability-related reasonable accommodation requests, discriminatorily criticizing her and/or holding her to higher standards than her non-disabled and/or younger coworkers, and/or the termination of Ms. Robare's employment, because Ms. Robare was over 40 years old and/or because the Plaintiff was an older woman or an older disabled person ("age plus" discrimination).

172.    Mr. Wilson was involved in the decision to undertake adverse actions against Ms. Robare, including the decision to terminate Ms. Robare.

173.    Mr. Wilson discharged, expelled, barred, and/or discriminated against Mr. Wilson in her compensation, conditions, and/or privileges of employment based on rights afforded to Ms. Robare under the NYSHRL.

174.    Mr. Wilson aided, abetted, incited, coerced, and/or compelled the Company's discriminatory conduct, including, but not limited to, by providing or attempting to provide assistance to individuals participating in conduct forbidden under the NYSHRL.

175.    The Company's actions against Ms. Robare were wanton, willful and malicious. The Company acted willfully and/or with reckless disregard to the state protected rights of Ms. Robare.

176.    As a direct and proximate result of the Defendants' violations of the NYSHRL, Ms. Robare has suffered and continues to suffer damages, including, but not limited to, lost compensation and benefits, other monetary damages, reduced earning capacity, pain and suffering, loss of enjoyment of life, and emotional damages.

177.    Ms. Robare  seeks all damages to which she is entitled, including, but not limited to, lost compensation and benefits (including, but not limited to, back pay and front pay), damages for diminished earning capacity and injury to reputation, other monetary damages, emotional distress damages, additional compensatory damages (including, but not limited to, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses), punitive damages, attorneys' fees, interest, and costs.

## COUNT IV

### (Age Discrimination in Violation of the Age Discrimination in Employment Act, 29 U.S.C. §§ 621 et seq.)

### Ms. Robare v. the Company

178.    Ms. Robare incorporates all paragraphs above and below as if set forth fully herein.

179.    At all relevant times, Ms. Robare was over 40 years old (born in 1972).

180.    During all relevant times, the Company was an employer under the Age Discrimination in Employment Act, 29 U.S.C. §§621 et. seq. (hereinafter the "ADEA") because it employed more than 20 persons for 20 or more calendar weeks within the previous 12-month period.

181.    The Company, by and through its agents, harassed and discriminated against Ms. Robare with respect to her compensation, terms, privileges, and/or conditions of employment because of Ms. Robare's age (currently 48).

182.    More specifically, the Company subjected Ms. Robare to adverse actions because of her age, including, but not limited to, a hostile and harassing workplace, denial of one or more of her disability-related reasonable accommodation requests, discriminatorily criticizing her and/or holding her to higher standards than her non-disabled and/or younger coworkers,  and/or the termination of Ms. Robare's employment, because Ms. Robare was over 40 years old and/or because the Plaintiff was an older woman ("age plus" discrimination).

183.    The Company willfully violated the ADEA because the Company knew or should have known its conduct was prohibited by Federal law and/or the Company acted with malice and/or reckless indifference to the federally protected rights of Ms. Robare.

184. As a direct and proximate result of the Defendant's violation of the ADEA, Ms. Robare has suffered and continues to suffer damages, including, but not limited to, lost compensation and benefits, other monetary harms, reduced earning capacity, pain and suffering, loss of enjoyment of life, and emotional damages.

185. Ms. Robare seeks all damages to which she is entitled, including, but not limited to lost compensation and benefits (including, but not limited to, back pay and front pay), damages for diminished earning capacity and injury to reputation, other monetary damages, compensatory damages (including, but not limited to, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses), liquidated damages, interest, attorney's fees, and costs.

**COUNT V**

**(Sex Discrimination and Harassment in Violation of Title VII, 42 U.S.C. §§2000e, et. seq.)**

**Ms. Robare v. the Company**

186. Ms. Robare incorporates all paragraphs above and below as if set forth fully herein.

187. During all relevant times, the Company was an employer under Title VII, 42 U.S.C. §§2000e, et. seq. (hereinafter "Title VII") because it employed more than 15 persons for 20 or more calendar weeks within the previous 12-month period.

188. The Company, by and through its agents (including, but not limited to, Mr. Wilson and Mr. Laduke), sexually harassed, otherwise harassed, and discriminated against Ms. Robare with respect to her compensation, terms, and/or the conditions or privileges of her employment because of Ms. Robare's sex.

189.    Indeed, Ms. Robare was subjected to continuous related instances of discrimination, sexual harassment, harassment, and/or retaliation that culminated in her termination and these unlawful actions were permitted by the Company to continue unremedied for so long as to amount to an ongoing discriminatory policy or practice.

190.    More specifically, the Company subjected Ms. Robare to adverse actions, including, but not limited to, a hostile, harassing, and sexually harassing workplace, discriminatorily criticizing her and/or holding her to higher standards than male employees, refusing to provide Ms. Robare with an adequate investigation into her protected concerns, denying one or more of her disability-related reasonable accommodation requests, and/or the terminating Ms. Robare's employment because she was a woman and/or because she was a woman who refused to accept, engage in, or reciprocate sexual harassment and/or refused to accept a sexually harassing and hostile work environment.

191.    As a direct and proximate result of the Company's violations of Title VII, Ms. Robare has suffered and continues to suffer damages, including, but not limited to, lost compensation and benefits, loss of earning capacity, other monetary harms, pain and suffering, loss of enjoyment of life, and emotional damages.

192.    The Company acted with malice and/or with reckless indifference to the federally protected rights of Ms. Robare.

193.    Ms. Robare seeks all damages to which she is entitled, including, but not limited to lost compensation and benefits (including, but not limited to, back pay and front pay), other monetary damages, diminished earning capacity, compensatory damages (including, but not limited to, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish,

loss of enjoyment of life, and other nonpecuniary losses), punitive damages, interest, attorney's fees, and costs.

## COUNT VI

### (Sex Discrimination and Harassment in Violation of New York State Human Rights Law, Executive Law Article 15, Section 296

### Ms. Robare v. all Defendants

194.    Ms. Robare incorporates all paragraphs above and below as if set forth fully herein.

195.    At all relevant times, the Company employed four or more persons.

196.    The Company is an employer under the definition of Executive Law Article 15 ("NYSHRL").

197.    The Company, by and through its agents, including, but not limited to, Mr. Wilson and Mr. Laduke, sexually harassed, otherwise harassed, and discriminated against Ms. Robare with respect to her compensation, terms, conditions, and/or privileges of employment, because of Ms. Robare's sex.

198.    Indeed, Ms. Robare was subjected to continuous related instances of discrimination, sexual harassment, harassment, and/or retaliation that culminated in her termination and these unlawful actions were permitted by the Company to continue unremedied for so long as to amount to an ongoing discriminatory policy or practice.

199.    More specifically, the Company subjected Ms. Robare to adverse actions, including, but not limited to, a hostile, harassing, and sexually harassing workplace, discriminatorily criticizing her and/or holding her to higher standards than male employees, refusing to provide Ms. Robare with an adequate investigation into her protected concerns, denying one or more of her disability-related reasonable accommodation requests, and/or the

terminating Ms. Robare's employment because she was a woman and/or because she was a woman who refused to accept, engage in, or reciprocate sexual harassment and/or refused to accept a sexually harassing and hostile work environment.

200.    Mr. Wilson was involved in the decision to undertake adverse actions against Ms. Robare, including the decision to terminate Ms. Robare.

201.    Mr. Wilson discharged, expelled, barred, and/or discriminated against Mr. Wilson in her compensation, conditions, and/or privileges of employment based on rights afforded to Ms. Robare under the NYSHRL.

202.    Mr. Wilson aided, abetted, incited, coerced, and/or compelled the Company's discriminatory conduct, including, but not limited to, by providing or attempting to provide assistance to individuals participating in conduct forbidden under the NYSHRL.

203.    The Company's actions were willful, wanton, reckless, and/or involved a conscious disregard of the rights of Ms. Robare and/or conduct so reckless to amount to such disregard.

204.    As a direct and proximate result of the Defendants' violations of the NYSHRL, Ms. Robare has suffered and continues to suffer damages, including, but not limited to, lost compensation and benefits, reduced earning capacity, other monetary harms, pain and suffering, loss of enjoyment of life, and emotional damages.

205.    Ms. Robare seeks all damages to which she is entitled, including, but not limited to lost compensation and benefits (including, but not limited to, back pay and front pay), other monetary damages, emotional distress damages, other compensatory damages (including, but not limited to, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish,

loss of enjoyment of life, and other nonpecuniary losses), punitive damages, injury to reputation, diminished earning capacity, interest, attorney's fees, and costs.

## COUNT VII

### (Interference with, and Retaliation for Exercising, Rights under the Family and Medical Leave Act – 29 U.S.C. §2615)

### Ms. Robare v. All Defendants

206.    Ms. Robare incorporates all paragraphs above and below as if set forth fully herein.

207.    During all relevant times, the Company was engaged in an industry affecting commerce and, upon information and belief, employed 50 or more employees for 20 or more calendar work weeks in each current and/or preceding calendar year.

208.    As such, at all relevant times, the Company was an employer under the FMLA.

209.    At all relevant times, upon information and belief, the Company employed 50 or more employees within 75 miles of Ms. Robare's worksite at 795 NY-3, Plattsburgh, NY 12901.

210.    At all relevant times (from July 2019 onward), Ms. Robare had worked for the Company for 12 or more months and had worked in excess of 1,250 hours within the past 12-month period.

211.    As such, from July 2019 onward, Ms. Robare was an eligible employee under the FMLA.

212.    Ms. Robare suffered from one or more serious health conditions, including, but not limited to, her COVID-19 symptoms, bronchial asthma, gastrointestinal, and cardiac symptoms.

213.    Ms. Robare was entitled to FMLA leave.

214.   Ms. Robare sought to exercise her rights under the FMLA, including by requesting and utilizing one or more protected leaves under the FMLA.

215.   Specifically, Ms. Robare requested continuous leave totaling approximately 10 to 11 weeks from in or around March 26, 2020 to on or around May 11, 2020, and again from June 22, 2020 to July 20, 2020.

216.   Ms. Robare timely notified Defendants that she would need FMLA leave.

217.   Defendants interfered with, restrained, and/or denied the exercise of, or the attempted exercise of, Ms. Robare's rights under the FMLA by replacing her while she was still out on a protected leave (thereby retroactively denying her request for leave) and failing to reinstate her to her same or equivalent position when she attempted to return from leave.

218.   Defendants, including by and through their agents, retaliated and/or discriminated against Ms. Robare for requesting and/or utilizing FMLA leave by subjecting Ms. Robare to adverse actions, including, but not limited to, subjecting Ms. Robare to a harassing and otherwise hostile work environment, by refusing to reinstate Ms. Robare to her prior position at the end of her FMLA leave, denying one or more of her disability-related reasonable accommodation requests, discriminatorily criticizing her and/or holding her to higher standards than employees who did not request/utilize FMLA leave, and/or terminating Ms. Robare's employment.

219.   Mr. Wilson was an employer under the FMLA because he was the owner of the Company, had the power to hire and/or fire Ms. Robare, supervised and controlled Ms. Robare's conditions of employment, including her work schedule, played a role in determining Ms. Robare's rate and method of payment, and/or played a role in maintaining Ms. Robare's employment records.

220.   Defendants' actions were willful and undertaken in bad faith.

221.     As a direct and proximate result of the Defendants' violation of the FMLA, Ms. Robare has suffered and continues to suffer damages, including, but not limited to, lost compensation and benefits, other monetary harms, loss of earning capacity, pain and suffering, loss of enjoyment of life, and emotional damages.

222.     Ms. Robare seeks all damages to which she is entitled, including, but not limited to, lost compensation and benefits (including, but not limited to, back pay and front pay), other monetary damages, compensatory damages (including, but not limited to, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses), injury to reputation, diminished earning capacity, liquidated (i.e. double) damages, interest, attorneys' fees, and costs.

## COUNT VIII

### (Retaliation in Violation of Plaintiff's Rights Under the Families First Coronavirus Response Act)

### Ms. Robare v. All Defendants

223.     Ms. Robare incorporates all paragraphs above and below as if set forth fully herein.

224.     The Company is an employer with less than 499 employees and is thus subject to the Families First Coronavirus Response Act (the "FFCRA").

225.     Mr. Wilson was an employer under the FFCRA because he had the power to hire and/or fire Ms. Robare, supervised and controlled Ms. Robare's conditions of employment including her work schedule, played a role in determining Ms. Robare's rate and method of payment, and/or played a role in maintaining Ms. Robare's employment records.  Further, Mr. Wilson was at all times acting in agency and representative capacity with the Company.

226.    Ms. Robare was eligible for sick leave and paid self-quarantine leave under the FFCRA.

227.    Ms. Robare requested leave because she was experiencing COVID-19 symptoms and/or the subsequent symptoms (the cardiac condition) that were related to, caused by, and/or exacerbated by Ms. Robare's COVID-19 symptoms, and was advised by her health care provider to self-quarantine, in keeping with relevant Government-issued quarantine guidelines, related to COVID-19 symptoms she was experiencing.

228.    The Defendants, including by and through their agents, retaliated and/or discriminated against Ms. Robare for requesting FFCRA leave by subjecting Ms. Robare to adverse actions including, but not limited to, subjecting Ms. Robare to a harassing and hostile work environment, denying one or more of her disability-related reasonable accommodation requests, discriminatorily criticizing her and/or holding her to higher standards than employees who did not request/utilize FFCRA leave, and/or the ultimate termination of Ms. Robare's employment.

229.    The Defendants' actions were willful and in bad faith.

230.    As a direct and proximate result of the Defendants' violation of the FFCRA, Ms. Robare has suffered and continues to suffer damages, including, but not limited to, lost compensation and benefits, loss of earning capacity, pain and suffering, loss of enjoyment of life, and emotional damages.

231.    Ms. Robare seeks all damages to which she is entitled, including, but not limited to, lost compensation and benefits (including, but not limited to, back pay and front pay), other monetary damages, compensatory damages (including, but not limited to, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and

other nonpecuniary losses), injury to reputation, diminished earning capacity, liquidated (i.e. double) damages, interest, attorney's fees, and costs.

## COUNT IX

### (Retaliation in Violation of the New York State Human Rights Law, Executive Article 15, Section 296)

### Ms. Robare v. all Defendants

232.    Ms. Robare incorporates all paragraphs above and below as if set forth fully herein.

233.    Ms. Robare engaged in protected activity under the NYSHRL, including, but not limited to, (i) opposing, voicing protected concerns, and/or engaging in other protected activity related to the harassing and discriminatory actions taken by the Defendants due to Ms. Robare's gender/sex and age; and/or (ii) requesting and utilizing reasonable accommodations for disabilities which were intended to allow Ms. Robare to perform the essential functions of her job.

234.    Ms. Robare further engaged in protected activity under the NYSHRL, including, but not limited to, by voicing protected concerns regarding the sexual harassment, otherwise harassing, and discriminatory actions improperly undertaken by the Company, and by Company employees and agents, including Mr. Wilson and Mr. Laduke, based on Ms. Robare's sex, age, disabilities, and/or regarding the creation of a hostile work environment through illegal harassment, sexual harassment, and discrimination.

235.    The Company retaliated against Ms. Robare for engaging in protected activity, including, but not limited to, by subjecting her to a hostile and harassing workplace, discriminatorily criticizing her and/or holding her to higher standards than her male, non-disabled, and/or younger coworkers, denying one or more of her disability-related reasonable

accommodation requests, refusing to provide Ms. Robare with an adequate investigation into her protected concerns, and the termination of Ms. Robare's employment.

236.    Mr. Wilson was involved in the decision to undertake adverse action(s) against Ms. Robare, including the decision to terminate Ms. Robare.

237.    Mr. Wilson discharged, expelled, barred, and/or discriminated against Ms. Robare in her compensation, conditions, and/or privileges of employment based on rights afforded to Ms. Robare under the NYCHRL.

238.    Mr. Wilson aided, abetted, incited, coerced, and/or compelled the Company's retaliatory conduct, including, but not limited to, by providing or attempting to provide assistance to individuals participating in conduct forbidden under the NYCHRL.

239.    The Defendants have engaged in retaliatory conduct with willful or wanton negligence, or recklessness, or a conscious disregard of the rights of others or conduct so reckless as to amount to such regard.

240.    As a direct and proximate result of the Company's violations of the NYSHRL, the Plaintiff has suffered and continues to suffer damages, including, but not limited to, lost compensation and benefits, reduced earning capacity, other monetary harms, pain and suffering, loss of enjoyment of life, and emotional damages.

241.    Ms. Robare seeks all damages to which she is entitled, including, but not limited to lost compensation and benefits (including, but not limited to, back pay and front pay), other monetary damages, emotional distress damages, other compensatory damages (including, but not limited to, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses), punitive damages, injury to reputation, diminished earning capacity, interest, attorney's fees, and costs.

**COUNT X**

**(Retaliation in Violation of the Americans with Disabilities Act, 42 U.S.C. §§12101, et seq.)**

**Ms. Robare v. The Company**

242.    Ms. Robare incorporates all paragraphs above and below as if set forth fully herein.

243.    Ms. Robare engaged in protected activity under the ADA, including, but not limited to: (i) requesting and utilizing reasonable accommodations for disabilities which were intended to allow Ms. Robare to perform the essential functions of her job; and/or (ii) engaging in other protected activity related to the failure of the Company to provide disability-related reasonable accommodations and/or the failure of the Company to engage in an interactive dialogue related to Ms. Robare's disabilities and requested accommodations.

244.    The disability-related accommodation requests which the Company retaliated against Ms. Robare for requesting included, but were not limited to, disability related leave for medical appointments, treatment, and recovery time, as well as protected measures to maximize her safety in light of the COVID-19 pandemic.

245.    The Company unlawfully coerced, intimidated, threatened, and/or interfered with Ms. Robare's exercising of, or enjoyment of, one or more rights granted by the ADA.

246.    More specifically, the Company subjected Ms. Robare to adverse actions in retaliation because she engaged in protected activity, including but not limited to, subjecting Ms. Robare to a harassing and otherwise hostile work environment, discriminatorily criticizing her and/or holding her to higher standards than her non-disabled coworkers, denying one or more of her disability-related reasonable accommodation requests, and/or terminating Ms. Robare's employment.

247.     The Company acted with malice and/or with reckless indifference to the federally protected rights of Ms. Robare.

248.     As a direct and proximate result of the Company's violation of the ADA, Ms. Robare has suffered and continues to suffer damages, including, but not limited to, lost compensation and benefits, loss of earning capacity, pain and suffering, loss of enjoyment of life, and emotional damages.

249.     Ms. Robare seeks all damages to which she is entitled, including, but not limited to lost compensation and benefits (including, but not limited to, back pay and front pay), other monetary damages, compensatory damages (including, but not limited to, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses), injury to reputation, diminished earning capacity, punitive damages, interest, attorneys' fees, and costs.

## COUNT XI

### (Retaliation in Violation of Title VII, 42 U.S.C. §§ 2000e, et seq.)

### Ms. Robare v. the Company

250.     Ms. Robare incorporates all paragraphs above and below as if set forth fully herein.

251.     Ms. Robare engaged in protected activity under Title VII, including, opposing, voicing protected concerns, and/or engaging in other protected activity related to concerns regarding the sexually harassing and discriminatory actions of Company employees, and/or by voicing protected concerns regarding the Company's failure to investigate, and/or failure to take measures to appropriately address, and/or inappropriate response related to Ms. Robare's expression of concerns regarding the sexually harassing behavior of its employees.

252.     Ms. Robare further engaged in protected activity under Title VII, including, but not limited to, opposing, voicing protected concerns, and/or engaging in other protected activity related to concerns regarding discrimination based on Ms. Robare's sex.

253.     The Company retaliated against Ms. Robare for engaging in protected activity, including, but not limited to, the aforementioned protected activity, by subjecting Ms. Robare to adverse actions including, but not limited to, a hostile, harassing, and sexually harassing workplace, discriminatorily criticizing her and/or holding her to higher standards than male coworkers, refusing to provide Ms. Robare with an adequate investigation into her protected concerns, denying one or more of her disability-related reasonable accommodation requests, and/or the termination of Ms. Robare's employment.

254.     The Company unlawfully coerced, intimidated, threatened, and/or interfered with Ms. Robare's exercising of, or enjoyment of, one or more rights granted by Title VII.

255.     The Company acted with malice and/or with reckless indifference to the federally protected rights of Ms. Robare.

256.     As a direct and proximate result of the Company's violations of Title VII, Ms. Robare has suffered and continues to suffer damages, including, but not limited to, lost compensation and benefits, loss of earning capacity, other monetary harms, pain and suffering, loss of enjoyment of life, and emotional damages.

257.     Ms. Robare seeks all damages to which she is entitled, including, but not limited to lost compensation and benefits (including, but not limited to, back pay and front pay), other monetary damages, diminished earning capacity, compensatory damages (including, but not limited to, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish,

loss of enjoyment of life, and other nonpecuniary losses), punitive damages, interest, attorney's fees, and costs.

WHEREFORE, the Plaintiff, Rebecca Robare, respectfully requests that this honorable court:

A.  Schedule this matter for trial by jury;

B.  Find the Defendants liable on all counts;

C.  Award the Plaintiff her lost compensation and benefits (including, but not limited to, back pay and front pay),

D.  Award the Plaintiff other monetary damages, including damages for her diminished earning capacity and injury to reputation;

E.  Award the Plaintiff emotional distress damages;

F.  Award the Plaintiff compensatory damages (including, but not limited to, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses);

G.  Award the Plaintiff liquidated damages;

H.  Award the Plaintiff punitive damages;

I.  Award the Plaintiff her reasonable attorneys' fees;

J.  Award the Plaintiff interest and costs;

K.  Award the Plaintiff all other damages to which she is entitled; and

L.  Grant such further relief as is just and equitable.

Respectfully Submitted,

REBECCA ROBARE

By her attorneys,

THE LAW OFFICES OF WYATT &
ASSOCIATES P.L.L.C

Date:   May 7, 2021                    By:            /s/Timothy Brock                    

Timothy Brock
tbrock@wyattlegalservices.com
NY State Bar: 5614151
NDNY Bar: 700697

Benjamin J. Wyatt
BWyatt@Wyattlegalservices.com
NY State Bar: 5604590
NDNY Bar: 700752

MAILING ADDRESS:
The Law Offices of Wyatt & Associates,
P.L.L.C.
63 Emerald Street PMB 603
Keene NH 03431

Main Office Address:
The Law Offices of Wyatt & Associates,
P.L.L.C.
17 Elm Street, Suite C211
Keene, NH 03431
Telephone: (603) 357-1111
Facsimile: (603) 685-2868

New York Office:
418 Broadway, 2nd Floor
Albany, NY 12207
Telephone: (603) 357-1111
Facsimile: (603) 685-2868